UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SAIDRICK PEWITTE, | |
| Plaintiff, | Case No. 3:17-cv-00822 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| DAMON HINIGER, et al., | |
| Defendants. | |

To:     The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

This civil rights action brought under 42 U.S.C. § 1983 arises out of pro se and *in forma
pauperis* Plaintiff Saidrick Pewitte's incarceration at the Trousdale Turner Correctional Center
(TTCC) in Hartsville, Tennessee. (Doc. No. 11.) Pewitte alleges that he suffers from multiple
serious health conditions, including hypertension and diabetes, and that he was frequently denied
access to prescription medications and regular glucose monitoring while incarcerated. (*Id.*) He
further alleges that medical personnel at TTCC failed to treat painful wounds on his legs caused
by swelling. (*Id.*) In screening Pewitte's amended complaint under 28 U.S.C. § 1915(e)(2), the
Court found that Pewitte stated colorable claims for violation of his Eighth Amendment right to
adequate medical care against Defendants Nurse Sue Smith and Dr. Robert Coble in their
individual capacities and against Defendant Health Services Administrators Joe Schweitzer and
Cynthia Pratt in their individual and official capacities. (Doc. No. 12.)

Smith, Coble, Schweitzer, and Pratt have filed a motion for summary judgment. (Doc.
No. 49.) Pewitte has responded in opposition (Doc. Nos. 53, 55) and the defendants have replied

(Doc. Nos. 54, 57). Having considered the record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the defendants' motion be denied.

## I.    Background

### A.    Factual Background[1]

TTCC is run by CoreCivic, Inc., a private for-profit corporation formerly known as Corrections Corporation of America. While Pewitte was incarcerated at TTCC, CoreCivic contracted with Correct Care Solutions (CCS), also a private company, to provide medical care to those housed in the facility. (Doc. Nos. 11, 51.) Defendants Smith, Coble, Schweitzer, and Pratt were employed by CCS to work at TTCC. (Doc. Nos. 11, 49-3–49-5, 49-7.)

#### 1.    Keep-On-Person Medications

Pewitte was transferred to TTCC from another correctional facility on July 14, 2016. (Doc. Nos. 11, 49-2, 51.) Pewitte's transfer medical paperwork and health questionnaire stated that he suffered from diabetes mellitus, hypertension, vascular insufficiency, edema (swelling caused by excess fluid), and sleep apnea and was being treated with five medications, only two of which were sent with him to TTCC. (Doc. No. 49-2.) All five medications were designated "keep on person," or "KOP," and were prescribed for daily use. (*Id.* at PageID# 805; Doc. No. 11.)

---

[1]    The facts in this section are drawn from Pewitte's verified amended complaint (Doc. No. 11), the defendants' summary judgment affidavits and exhibits (Doc. Nos. 49-1–49-8), which include excerpts from Pewitte's TTCC medical records (Doc. No. 49-2), the defendants' statement of undisputed material facts (Doc. No. 51), and Pewitte's summary judgment exhibits (Doc. No. 53). A verified complaint carries the same evidentiary weight as an affidavit for purposes of summary judgment. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008). Defendants' argument that the Court may not consider Pewitte's summary judgment exhibits because the documents are unsworn and uncertified (Doc. No. 54) is without merit. The 2010 amendments to Federal Rule of Civil Procedure 56 "omitted . . . [t]he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration . . . ." Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment.

### a.    July and August 2016

On July 15, 2016, Dr. Richard Aballay wrote physician's orders authorizing five medications for Pewitte—Spironolactone, Furosemide, Amlodipine, potassium chloride, and vitamin B6. (Doc. Nos. 11, 49-2, 51.) Spironolactone and Furosemide are used to treat fluid retention and swelling; Amlodipine is a blood pressure medication; and potassium chloride is used to prevent hypokalemia (low potassium). (Doc. No. 49-1.) The parties dispute when Pewitte received these medications. Pewitte states that he did not receive them for more than two-and-a-half weeks, during which he submitted multiple sick call requests addressing his missing medications. (Doc. No. 11.) Pewitte alleges that this delay was caused by Schweitzer, a CCS health services administrator, who "fail[ed] to process the new physician's order . . . for keep-on person drugs[ ] and ensure the necessary requisition forms were transmitted to the appropriate pharmaceutical supplier . . . ." (*Id.* at PageID# 80, ¶ 30.) Pewitte states that, from July 14, 2016, until August 1, 2016, he "was completely out of [three] prescribed drugs: (i) Vitamin B-6; (ii) Furosemide; and (iii) Potassium [Chloride]." (*Id.* at PageID# 88, ¶ 62.)

The defendants state that Pewitte was provided with Spironolactone and Amlodipine on July 25, 2016, and Potassium Chloride, Furosemide, and Meloxicam sometime in July 2016. (Doc. Nos. 49-1, 49-2, 51.) Schweitzer states that he did not "approve or transmit medication orders" in his position as a health services administrator. (Doc. No. 49-3, PageID# 812, ¶ 19.) According to Schweitzer, "[i]f an inmate complained about not receiving medication, [he] reviewed the chart to confirm whether the medication had been received and/or ordered, and if additional actions were needed, [he] would notify CCS medical providers." (*Id.* at PageID# 811, ¶ 17.)

### b.    September 2016—January 2017

Pewitte states that, during a TTCC lockdown in September 2016, he again "did not receive his monthly supplies of prescribed keep on person medications because [Schweitzer] failed to

employ sufficient staff to timely distribute the medications." (Doc. No. 11, PageID# 87, ¶ 58.) He further states that he

> was completely out of several of his different keep-on-person medications from the first part of November 2016, until close to the end of January 2017, because [the] keep-on-person medications were not delivered, his written requests were misplaced, lost, or simply ignored, and when he requested his keep-on-person medications from the pill-window of the infirmary, a nurse stated that they were not available because they had not been ordered.

(*Id.* at PageID# 87, ¶ 59.) Pewitte states that, on January 21, 2017, he went to the TTCC infirmary for a morning glucose check and

> inquired about his much needed Spironolactone, Furosemide, and Amlodipine, and ask[ed] whether his medications were available for pick up. In response, Nurse Virginia Cox . . . stated that she was unable to find any KOP[]s in the infirmary which had been ordered for him. When Mr. Pewitte complained that he had been completely out of his KOP[]s for over two weeks, Nurse Cox finally intervened in the matter, and placed a new order for his medications.

(*Id.* at PageID# 108, ¶ 132.) Pewitte alleges that Pratt became health services administrator for TTCC in January 2017, that it was her responsibility "to ensure the new medical prescription orders were properly transmitted to the pharmaceutical supplier[,]" and that she "did not transmit" orders for Pewitte's medications to an "outside pharmaceutical supplier . . . ." (*Id.* at PageID# 106, ¶ 126.)

The defendants state that Pewitte had his keep-on-person medications as of September 14, 2016, and that he was provided with "[s]ixty 'Keep on Person' B6 tablets and thirty "Keep on Person" Amlodipine, Furosemide, and Potassium Chloride tablets . . . in October 2016[;]" "[t]hirty Spironolactone tablets . . . in November 2016[;]" "sixty 'Keep on Person' B6 tablets" on November 15, 2016; "thirty 'Keep on Person' Vitamin B6 tablets in December 2016[;]" "thirty 'Keep on Person' Amlodipine, Furosemide, Potassium Chloride, and Spironolactone tablets" sometime in January 2017; and "sixty 'Keep on Person' Vitamin B6 tablets" on January 18, 2017. (Doc. No. 49-1, PageID# 693–94, ¶¶ 14, 17–19, 21; Doc. No. 51, PageID# 863–65, ¶¶ 11, 14–16, 18.) Schweitzer and Pratt both state that, as health services administrators, they were "not involved

4

with determining the number of medical staff who worked at any given time[.]" (Doc. No. 49-3, PageID# 810, ¶ 3; Doc. No. 49-4, PageID# 814, ¶ 3; Doc. No. 51, PageID# 868, ¶ 32.)

## 2. Glucose Monitoring

Pewitte states that, during his first week at TTCC, he "sought to go to the medical infirmary every day so that medical staff could monitor his blood glucose levels" and "complain[ed] that the medical staff were not monitoring his glucose levels as needed to check and control his diabetic condition." (Doc. No. 11, PageID# 82–83, ¶¶ 36, 38.) During this time, Pewitte "felt weak and tired[,] . . . experienced swelling in his lower extremities[,] and had a difficult time walking." (*Id.* at PageID# 83, ¶ 39.) A corrections officer told Pewitte "that the only way that he could get to the infirmary was to lay down on the floor and start flopping about like a fish out-of-water[.]" (*Id.* at PageID# 83, ¶ 38.) Pewitte states that, throughout his time at TTCC, he was unable to have his glucose levels regularly checked twice a day, particularly when the facility was on lockdown, which happened frequently. (Doc. No. 11.) He describes forty-five days between July and October 2016 when he "could not walk to the infirmary to have his glucose levels checked because the entire prison was on lockdown status." (*Id.* at PageID# 93–103, ¶¶ 75–119.) Pewitte alleges that his glucose levels were not checked on these days because "Schweitzer failed to establish safeguards and procedures" for administering glucose tests during lockdowns. (*Id.*)

The defendants state that Pewitte's "blood sugar and blood pressure levels were well controlled for a person with diabetes" (Doc. No. 49-1, PageID# 692, ¶ 9; Doc. No. 51, PageID# 862, ¶ 6) and that he "received blood sugar accu-checks on January 9, 10, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, and 31, 2017" (Doc. No. 49-1 PageID# 694, ¶ 23; Doc. No. 51, PageID# 866, ¶ 20). The defendants state that, "[d]uring lock down periods [at TTCC], the practice was for nurses to come to the units for pill call and diabetic call" and that "[a]n inmate could choose whether to participate in pill call and diabetic call[.]" (Doc. No. 51,

PageID# 869, ¶¶ 35, 38.) They further state that "Health Services Administrators did not create policies and procedures for lock down, medication distribution or procurement, or blood glucose checks[.]" (*Id.* at PageID# 868, ¶ 34.)

### 3. Pewitte's Interaction with Schweitzer

Pewitte alleges that he saw Schweitzer at some point in 2016 and "ask[ed] him why [Pewitte] was not receiving his keep-on-person medication." (Doc. No. 11, PageID# 86, ¶ 54.) Schweitzer responded that "[h]e did not have anybody to fill the orders[ ] because" his team was "understaffed" and his "people [were] overworked[.]" (*Id.* at PageID# 87, ¶ 54.) Pewitte asked Schweitzer "why he was not sending medical staff to [Pewitte's] housing unit to perform twice daily monitoring of his blood glucose levels during . . . protracted lock-down periods . . . ." (*Id.* at PageID# 87, ¶ 55.) Pewitte states that "Schweitzer simply 'looked at' him in disgust, turned his head and walked away[.]" (*Id.* at PageID# 87, ¶ 57.) Schweitzer denied these allegations in his answer (Doc. No. 36), but does not address them in the affidavit he submitted in support of the defendants' motion for summary judgment (Doc. No. 49-3), and the defendants do not address this alleged encounter in their statement of undisputed material facts (Doc. No. 51).

### 4. Pewitte's Clinic Visit with Smith

On July 25, 2016, Pewitte saw Smith in the TTCC infirmary. (Doc. Nos. 11, 49-2, 51.) Smith completed a "chronic disease clinic treatment plan" form for Pewitte, listing his chronic conditions as obstructive sleep apnea, hypertension, vascular insufficiency, diabetes mellitus, and chronic pain. (Doc. No. 49-2, PageID# 709; Doc. Nos. 49-5, 51.) She checked boxes indicating that Pewitte had a "good" degree of control over his diabetes and hypertension and a "fair" degree of control over his sleep apnea, vascular insufficiency, and chronic pain. (Doc. No. 49-2, PageID# 709.) Smith indicated that Pewitte was adhering to his prescribed diet and medications, but noted "med out 7/24/16[.]" (*Id.*) She reported no edema in Pewitte's extremities but recorded

6

that he had bilateral knee pain. (Doc. Nos. 49-2, 51.) Smith prescribed Meloxicam for Pewitte's knee pain and noted that he should have laboratory tests in sixty days and another clinic visit in ninety days. (*Id.*) She also noted that she would complete a request for a new face mask for Pewitte's CPAP machine. (*Id.*)

The parties dispute the extent to which Smith examined Pewitte's legs during the July 25, 2016 visit. Pewitte states that, during this visit, he "complained about chest pains, throbbing migraine-like headaches and his legs swelling, because he had not been provided his prescribed keep-on-person drugs[,]" and "showed Nurse Smith his lower legs, so that[ ] she could see the large and painful clusters of burst boils and open ulcers on his legs." (Doc. No. 11, PageID# 84, ¶ 44.) He also complained that "the medical staff had not been monitoring his glucose levels[.]" (*Id.* at PageID# 85, ¶ 46.) Pewitte states that "[t]he entire visit lasted less than two minutes[.]" (*Id.* at PageID# 85, ¶ 48.) Smith states that she palpitated Pewitte's extremities to diagnose edema but denies seeing leg wounds and denies that Pewitte complained about his legs. (Doc. No. 49-5.) According to Smith, "[h]ad [Pewitte] complained of or had [she] seen any leg wounds, [she] would have noted this, further examined his legs and provided additional care, if needed[.]" (*Id.* at PageID# 820, ¶ 12.)

### 5.    Pewitte's Clinic Visit with Coble

On January 3, 2017, Pewitte saw Coble in the TTCC infirmary. (Doc. Nos. 11, 49-2, 49-7, 51.) Coble completed a chronic disease clinic treatment plan form, noting that Pewitte still suffered from sleep apnea, hypertension, diabetes mellitus, and chronic pain syndrome and that he was experiencing bilateral hand pain. (Doc. Nos. 49-2, 51.) Coble checked boxes on the form indicating that Pewitte had good control over his sleep apnea and diabetes mellitus and fair control over his hypertension and chronic pain syndrome. (Doc. No. 49-2.) Coble completed physician's orders for

a new CPAP face mask and a therapeutic diet for 90 days and prescribed 500 mg of Naproxen for 180 days. (Doc. Nos. 49-2, 51.)

The parties dispute whether Pewitte complained of leg pain and showed Coble his legs during the January 3, 2017 visit. Pewitte states that he "complained of suffering from the adverse effects of fluctuating blood glucose levels, including throbbing migraine-like headaches, and also, aggravated edema resulting in extreme swelling in his lower legs . . . ." (Doc. No. 11, PageID# 105, ¶ 123.) According to Pewitte, Coble "'look[ed] at' the large and painful clusters of burst boils and open ulcers on his legs, [but] never made any significant changes to [his] prescribed medications or order[ed] any treatment for the carbuncles." (*Id.* at PageID# 105, ¶ 124.) Coble states that "[h]ad [Pewitte] complained of leg pain, boils or ulcers, or had [Coble] seen anything of this nature, [he] would have performed additional examination and noted it in the record." (Doc. No. 49-7, PageID# 835, ¶ 5.)

### 6. Pewitte's Letters, Sick Call Requests, and Grievances

Pewitte submitted numerous sick call requests, grievances, and letters to Schweitzer, Pratt, and others at TTCC regarding his lack of access to prescribed keep-on-person medications and regular glucose checks and the resulting injuries to his legs. (Doc. No. 53.) He submitted many of these between July 2016 and early 2017, the time period most relevant to his claims in this action.

On July 15, 2016, the day after he arrived at TTCC, Pewitte filled out a sick call request, asking for a "chronic care visit" and stating that his "[h]ands [were] numb[,] [his] wrists swollen and hurting[,] . . . [he was] almost out of medicines[,] . . . [and he had] pain in both legs[.]" (*Id.* at PageID# 889.) On July 24, 2016, Pewitte wrote a letter to Assistant Warden Yolanda Pittman, complaining that his legs were swelling because he was out of his keep-on-person medications:

> I've been . . . [at TTCC] about 10 days and I've been out of my meds since I've been here. I haven't seen a doctor . . . . My legs have beg[u]n to swell and I'm feeling bad most of the time. I'm a "diabetic" and suffer from hypertension coupled

8

with my body retaining fluid[;] my legs stay swol[l]en and I have agonizing
headaches and pain in my legs. Please assist me in this matter. I need your help to
get my serious medical needs me[]t . . . .

(*Id.* at PageID# 888.)

Pewitte again complained about not receiving medication and glucose monitoring in a letter
to Schweitzer dated August 5, 2016: "not only am I not receiving my KOP[]s from the [pill]
window[,] but the medical staff are still not responding to my pleas about coming to the unit to
check blood sugar levels or even calling me to the clinic for checks." (*Id.* at PageID# 885) In a
grievance form signed on September 7, 2016, Pewitte complained about his missing medications
and resulting injury to his legs: "I've tried multiple [times] to send grievances about not being able
to get meds[.] My legs are swollen and bursting or splitting in spot[]s from fluid build up." (*Id.* at
PageID# 890.) Another letter from Pewitte to Schweitzer, dated September 19, 2016, again
complains about "not being able to go to the infirmary to check blood sugar levels" and "the
nursing staff not coming to the units to check levels even though the medical staff know[ ]s
[Pewitte's] medical history . . . ." (*Id.* at PageID# 886.)

On a grievance form signed on September 22, 2016, Pewitte states that he "was denied
[his] right to go to the med window for [his] KOP[]s" and asks that TTCC officials "either provide
ample time to get KOP[]s or make arrangement[s] to send them to the units." (*Id.* at PageID# 892.)
Specifically, Pewitte states that a corrections officer "called for KOP[]s and so we all lined up at
the door[,] but [then] she said that they hadn't called our unit yet and so time elapsed . . . [and] we
were never afforded the opportunity to go get our meds . . ." (*Id.* at PageID# 893.) A third letter
from Pewitte to Schweitzer, dated October 14, 2016, reiterates his complaints about not receiving
medication or glucose checks and feeling ill:

I'm continually writing and complaining to you about not being able to get me meds
and not being able to check my blood sugar levels. The staff will not even make
arrangements to have me or other diabetics brought to the clinic for checks or come

to the unit for checks while on lockdown. Our health do[es]n't miracu[l]ously get beeter while on lockdown[,] it gets worse if not monitored. I'm having sick spells and no one cares . . . . Please help me.

(*Id.* at PageID# 887.)

On November 13, 2016, Pewitte again wrote to Pittman explaining his chronic conditions, complaining about not getting his medications, and describing in detail the injuries to his legs: "My legs have beg[u]n to swell and split and or burst open in spots after blisters have formed, or pulse pockets. My body retains fluid and I take Furosemide 80mg which I'm not getting. I need my meds. 'Please' can you please help me in this serious matter." (*Id.* at PageID# 894.) Pewitte signed a grievance form on the same day complaining about not receiving his prescribed medications and describing his leg injuries: "I've put in multiple request[s] and grievances about not being able to get meds[.] I'm a diabetic and my body builds and holds fluid[.] I have leaking sores on my leg because I'm not getting meds consistently." (*Id.* at PageID# 895.) In a sick call request dated December 31, 2016, Pewitte again reports "swollen legs that ha[ve] split open and have healing sores in spots." (*Id.* at PageID# 896.)

On March 23, 2017, Pewitte wrote a letter to Pratt explaining that, without glucose monitoring and his prescription medications, Pewitte was having medical "issues" ranging from his "legs swelling up and opened sores running . . . out of [his] legs, to severe he[ad]aches, dizziness, cold sweats, [and] weakness[,] to being very sick . . . ." (*Id.* at PageID# 898.)

## B. Procedural History

Pewitte initiated this action on May 10, 2017, by filing a complaint under 42 U.S.C. § 1983 and an application for leave to proceed *in forma pauperis*. (Doc. Nos. 1, 2.) The Court granted Pewitte's application but found that his "complaint [was] frequently illegible and [did] not allege the relevant facts with the clarity necessary for the court to determine whether or against whom

the plaintiff states a claim for relief." (Doc. No. 3, PageID# 45.) The Court therefore ordered Pewitte to

> file a supplement to his complaint in which he clearly states, <u>legibly and in plain English</u>, what each defendant did or failed to do that allegedly harmed him, when and where those facts occurred, what harm he suffered as a result of the defendants' actions, and what relief he is seeking from his lawsuit.

(*Id.* (emphasis in original).)

Pewitte filed a verified amended complaint on October 3, 2017. (Doc. No. 11.) On January 24, 2018, the Court screened the amended complaint under 28 U.S.C. § 1915(e)(2), finding that Pewitte had "state[d] nonfrivolous claims for deliberate indifference to medical needs against Coble and Smith" based on allegations "that, although Coble and nurse Smith addressed the treatment for [Pewitte's] underlying diabetes, they provided no treatment at all for the related painfully infected leg wounds." (Doc. No. 12, PageID# 133.) The Court further found that Pewitte had "state[d] non-frivolous claims against defendants Schweitzer and Pratt in both their individual and official capacities" based on allegations that Pewitte's

> inability to obtain prescribed medication or glucose monitoring on a regular basis [was] not the fault of any nurse or officer on the floor but [was] the direct result of 1) policies and procedures that do not provide for such access during commonplace prison lockdowns, and 2) the health administrators' personal delay in the approval and transmission of physicians' medication orders.

(*Id.* at PageID# 132.) Defendants Smith, Coble, Schweitzer, and Pratt answered Pewitte's amended complaint on April 4, 2019. (Doc. Nos. 34–37.) The Court entered a scheduling order and the parties engaged in discovery. (Doc. No. 38.)

On December 9, 2019, Smith, Coble, Schweitzer, and Pratt filed a motion for summary judgment accompanied by a supporting memorandum of law, a statement of undisputed material facts, and several affidavits and exhibits. (Doc. Nos. 49–51.) The defendants argue that they were not deliberately indifferent to Pewitte's serious medical needs and are entitled to summary

judgment on all of Pewitte's individual capacity claims because Pewitte never complained about or showed his leg injuries to Smith and Coble and because Schweitzer and Pratt were not involved in approving or obtaining prescription medications at TTCC. (Doc. No. 50.) The defendants further argue that they are entitled to summary judgment on Pewitte's official capacity claims because he cannot show a violation of his constitutional rights and, in the alternative, cannot show that CCS policies caused any such violation. (*Id.*)

On January 21, 2020, the Court received an affidavit from Pewitte responding to the defendants' summary judgment arguments and attaching his own supporting evidence, including sick call requests, grievances, and letters he wrote asking for help getting his medications and glucose monitoring. (Doc. No. 53) The Court construes this filing as Pewitte's response in opposition to the defendants' summary judgment motion. Pewitte did not file a separate response to the defendants' statement of undisputed material facts. In his response, Pewitte disputes that he received any medication on July 25, 2016, and states that he did not sign for medication on many of the dates on which the defendants say he did. (*Id.*) He states that the lack of medications and glucose monitoring caused his legs to swell "until they [were] cracked and abrasive, [with] pulse spots on them in places" and that he still has scars from these injuries. (*Id.* at PageID# 873.) Pewitte signed the affidavit on December 18, 2019 (Doc. No. 53), and a stamp from the institution where Pewitte is incarcerated suggests that the institution received the document for mailing on January 8, 2020 (*id.* at PageID# 918).

The defendants responded to Pewitte's filing, arguing that it was untimely, that the facts asserted in their statement of undisputed material facts should be taken as true for purposes of summary judgment, and that their motion for summary judgment should be granted as unopposed. (Doc. No. 54.) They also argued that the Court should not consider any of the documents Pewitte

attached to his affidavit because they were unsworn and uncertified. (*Id.*) Although docketed as a response, the Court construes this filing as the defendants' reply brief.

Pewitte filed a supplemental response asserting that he mailed his affidavit to the Court on December 19, 2019, not on January 21, 2020, and argued that "[t]he documents [he] submitted were actual copies of material submitted to [the TTCC] clinic and grievance office[.]" (Doc. No. 55, PageID# 926.) On February 28, 2020, the defendants replied to Pewitte's supplemental filing, again arguing that they are entitled to summary judgment as a matter of law because Pewitte failed to file a timely response in opposition to their motion and failed to specifically respond to their statement of undisputed material facts. (Doc. No. 57.)

## II.      Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698

F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts "need consider only the cited materials, but . . . may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The record evidence must be viewed in the light most favorable to the non-moving party and all reasonable inferences drawn in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

III.     **Analysis**

The Court finds that Pewitte filed a timely response to the defendants' motion for summary judgment; that the record in this action—which includes Pewitte's verified amended complaint and the documents he attached to his response in opposition to the defendants' motion—includes genuine issues of material fact regarding Pewitte's claims against Smith and Coble in their individual capacities; and that the defendants have not carried their initial burden to show that

summary judgment is warranted with respect to Pewitte's claims against Schweitzer and Pratt in their individual and official capacities.

### A.     Pewitte's Response in Opposition to the Defendants' Motion

The defendants filed and served their motion for summary judgment on December 9, 2019. (Doc. No. 49.) The scheduling order in this action provides that Pewitte's response in opposition was therefore due by January 9, 2020. (Doc. No. 38.) However, because the defendants served their motion on Pewitte by mail (Doc. No. 49), Federal Rule of Civil Procedure 6 extends the response deadline to January 13, 2020. *See* Fed. R. Civ. P. 6(a), (d). Pewitte filed his affidavit by mail from the facility where he is incarcerated, and the Court did not receive it until January 21, 2020. (Doc. No. 53.)

Pewitte argues that his response was timely because it was mailed on December 19, 2019. (Doc. No. 55.) The defendants have not responded to this argument, which invokes a well-established rule governing filings by incarcerated pro se plaintiffs. Under the "prison mailbox rule[,] . . . a pro se prisoner's [pleading] is deemed filed when it is handed over to prison officials for mailing to the court." *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citing *Richard v. Ray*, 290 F.3d 810, 812–13 (6th Cir. 2002)). The rationale for this rule is that "*pro se* prisoners have no control over delays between the prison authorities' receipt of [a pleading] and its filing, and their lack of freedom bars them from delivering the notice to the court clerk personally." *Houston v. Lack*, 487 U.S. 266, 273–74 (1988) (emphasis in original). The Supreme Court first applied this rule to notices of appeal, *see id.*, and lower courts have extended its application to habeas corpus petitions, civil complaints, motions, and responsive briefs. *Vandiver v. Corr. Med. Servs., Inc.*, No. 05-CV-72835, 2006 WL 2516902, at *1 (E.D. Mich. Aug. 29, 2006) (discussing history of prison mailbox rule and applying it to pro se plaintiff's response in opposition to motion for summary judgment); *see also Lyons–Bey v. Pennell*, 93 F. App'x 732, 733–34 (6th Cir. 2004)

(applying prison mailbox rule to response in opposition to motion to dismiss). Courts applying the prison mailbox rule assume, "absent contrary evidence," that an incarcerated person handed over a pleading to prison authorities "on the date he or she signed [it]." *Brand*, 526 F.3d at 925.

The Court finds that the prison mailbox rule applies to Pewitte's response to the defendants' motion for summary judgment. *See, e.g.*, *Vandiver*, 2006 WL 2516902, at *1. Pewitte signed the affidavit on December 18, 2019, and states that he gave it to prison officials for mailing on December 19, 2019. (Doc. Nos. 53, 55.) Accordingly, under the prison mailbox rule, Pewitte timely filed his response before the January 13, 2020 deadline. *See Brand*, 526 F.3d at 925. Even assuming that the institutional stamp on the envelope the Court received constitutes "contrary evidence" that Pewitte did not hand over the affidavit for mailing until January 8, 2020, the affidavit was still timely filed before January 13, 2020. *Id.*

The defendants further argue that the Court should not consider the documents Pewitte attached to his response because they "are unsworn and uncertified copies of documents that contain handwritten notes by" Pewitte. (Doc. No. 54, PageID# 921, ¶ 9.) In support of this argument, the defendants cite a 2003 opinion from the U.S. District Court for the Western District of Michigan, interpreting what was then Rule 56(e) and finding that courts "should not consider unsworn or uncertified documents, unsworn statements, inadmissible expert testimony, or hearsay evidence in resolving a Rule 56 motion." (*Id.* at PageID# 921, ¶ 8 (citing *Tolliver v. Fed. Republic of Nigeria*, 265 F. Supp. 2d 873, 879 (W.D. Mich. 2003)).) But the defendants ignore the 2010 amendments to Rule 56, which omitted certain provisions of former Rule 56(e) including "[t]he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration . . . ." Fed. R. Civ. P. 56(c) advisory committee's note to

2010 amendment. This argument is therefore without merit, and the Court will consider Pewitte's evidence.

Finally, even if Pewitte had not filed a timely response to their motion for summary judgment, the defendants would still bear the initial burden of showing that no genuine questions of material fact exist based on the record in this case. The Sixth Circuit has long held that "a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his initial] burden." *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998) (alteration in original) (quoting *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)); *see also Carver*, 946 F.2d at 454–55 (holding that "a party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . regardless if an adverse party fails to respond").

### B. Local Rule 56.01 and the Defendants' Initial Burden Under Federal Rule of Civil Procedure 56

This Court's Local Rule 56.01 provides that "any motion for summary judgment . . . must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Under this rule, "[e]ach fact must be set forth in a separate, numbered paragraph [and] . . . must be supported by specific citation to the record." *Id.* Any party opposing a motion for summary judgment must specifically respond to each asserted fact by: "(1) Agreeing that the fact is undisputed; (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) Demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record." M.D. Tenn. R. 56.01(c) (response to statement of facts). Pro se parties are not excused from complying with this rule. *See id.* Indeed,

the Court's scheduling order in this action instructed the parties to "refer to Federal Rule of Civil Procedure 56 and Local Rule 56.01 for summary judgment procedures[,]" described Local Rule 56.01's requirements, and warned the parties that "[f]ailure to respond in opposition to a statement of material fact may result in the Court assuming that the fact is true for purposes of summary judgment." (Doc. No. 38, PageID# 480); *see also* M.D. Tenn. R. 56.01(f) (failure to respond) ("If a timely response to a moving party's statement of material facts . . . is not filed within the time periods provided by these rules, the asserted facts shall be deemed undisputed for purposes of summary judgment.").

The defendants filed a statement of undisputed material facts that complies with the requirements of Local Rule 56.01 and includes citations to affidavits and other documents in the summary judgment record. (Doc. No. 51.) They argue that, because Pewitte has failed to specifically respond to their statement of undisputed material facts, the facts in the statement must be taken as undisputed under Local Rule 56.01(f) and their motion for summary judgment must be granted. (Doc. Nos. 54, 57.) While the defendants are correct that Local Rule 56.01(f) requires the Court to take an unaddressed asserted undisputed fact as true, the conclusion that summary judgment is therefore warranted does not automatically follow. Pewitte's failure to specifically respond to the defendants' statement of undisputed material facts does not lessen the defendants' initial burden to show an absence of any genuine dispute of material fact under Federal Rule of Civil Procedure 56. *See Carver*, 946 F.2d at 454–55 ("[A] party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . regardless if an adverse party fails to respond."); *Felix v. Young*, 536 F.2d 1126, 1135 (6th Cir. 1976) ("[T]he fact that the movant's affidavits are uncontroverted does not necessarily mean that

summary judgment should be granted[;] the ultimate burden of proving the propriety of summary judgment remains on the moving party.").

"Rule 56 first imposes a burden of production on the moving party to make a prima facie showing that it is entitled to summary judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.1 (4th ed. updated Apr. 2020). "In this context, a 'prima facie' showing means that, in the absence of evidence to the contrary, the movant's evidence is sufficient to entitle the movant to summary judgment." 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.40 (3d ed. 2020). Courts must view the movant's evidence in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) ("[T]he moving party . . . ha[s] the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."); *see also Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017) (viewing defendant's summary judgment evidence in light most favorable to plaintiff, finding it insufficient, and affirming, in part, district court's denial of summary judgment). If the moving party's evidence is insufficient, "'[n]o defense . . . is required'" and summary judgment must be denied. *Adickes*, 398 U.S. at 161 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 56.22(2) (2d ed. 1966)); *see also Evans*, 687 F. App'x at 446 (affirming, in part, denial of summary judgment where cited video evidence was insufficient to satisfy defendant's initial burden and plaintiff's opposition did not address that evidence); 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.1 (4th ed. updated Apr. 2020) ("If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.").

Accordingly, even though Pewitte did not respond to the defendants' statement of undisputed material facts, the Court still must examine the defendants' evidence to determine if it is sufficient to satisfy their initial summary judgment burden. *See Adickes*, 398 U.S. at 160 ("'[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'" (quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment)); *Evans*, 687 F. App'x at 446; *see also Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (holding that defendant "did not carry its initial burden of production" where evidence it produced in support of motion for summary judgment "purport[ed] to negate an essential element of plaintiffs' claim—timely notice—but . . . d[id] not actually do so"). Under Rule 56(c)(3), the Court may also look to other materials in the record in its review. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("[A] court may consider record materials not called to its attention by the parties.").

### C. Pewitte's § 1983 Claims

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Here, Pewitte alleges that Smith, Coble, Schweitzer, and Pratt were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The defendants argue that they are entitled to summary judgment because

Pewitte cannot show, based on record evidence, that they violated his constitutional rights in either their individual or official capacities.[2]

### 1. Pewitte's Individual Capacity Claims Against Smith, Coble, Schweitzer, and Pratt

The Eighth Amendment, which applies to state governments through the Fourteenth Amendment, "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). A deliberate indifference claim against an individual actor has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Blackmore*, 390 F.3d at 895. The objective component requires showing the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (emphasis in original) (quoting *Blackmore*, 390 F.3d at 897). The subjective component requires a plaintiff to show that the prison official had "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). Courts determine this subjective component "'in light of the prison authorities' current attitudes and conduct.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). The Supreme Court has

---

[2]     The defendants have not disputed that they are state actors for purposes of liability under § 1983. Because the defendants perform the traditional state functions of operating a prison and providing medical services to persons in state custody, they act under color of state law and are subject to suit under 42 U.S.C. § 1983. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993)).

long held that this showing "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

### a. Smith

Pewitte alleges that Smith was deliberately indifferent to his serious medical needs because she was aware of the severe swelling in Pewitte's legs and the resulting sores and wounds and failed to treat those injuries. Smith argues that she is entitled to summary judgment on Pewitte's claims against her in her individual capacity because there is no genuine dispute regarding Smith's cited testimony that she was not aware of any serious injuries to Pewitte's legs. (Doc. No. 50.) The Court must examine the cited evidence, and may examine other record evidence, to determine if Smith has satisfied her initial burden to show that summary judgment is warranted with respect to this claim. *See Adickes*, 398 U.S. at 160; *Evans*, 687 F. App'x at 446; *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106; *see also* Fed. R. Civ. P. 56(c)(3).

The defendants' statement of undisputed material facts does not directly address whether Smith observed injuries to Pewitte's legs. It does include assertions—based on Smith's testimony and the medical records in evidence—that, in Pewitte's July 25, 2016 chronic care visit, "Smith noted 'no edema' in his extremities" and that, in a March 28, 2017 chronic care visit, "Smith noted 'edema +2 in both legs'" and that Pewitte "complained of swelling in both legs." (Doc. No. 51, PageID# 862, 866–67, ¶¶ 6, 25.) The Court accepts these facts as true.

22

In a supporting affidavit, Smith states that she palpated Pewitte's extremities to diagnose edema and that, "[h]ad [Pewitte] complained of or had [she] seen any leg wounds, [she] would have noted this, further examined his legs and provided additional care, if needed[.]" (Doc. No. 49-5, PageID# 820, ¶ 12). Smith's affidavit further states that, when Smith saw Pewitte for a clinic visit on March 28, 2017, Pewitte "complained of swelling in both legs" and Smith diagnosed him with edema in both legs and "recommended accu-checks twice per day, labs, and continued medications of Amlo[d]i[p]ine, Lasix, Naproxen, Potassium Chloride, Spironolactone, and B6[.]"[3] (Doc. No. 49-5, PageID# 819, ¶ 8.) This evidence, construed in the light most favorable to Pewitte, satisfies Smith's initial burden to demonstrate the absence of a genuine dispute of fact that she was not aware of injuries to Pewitte's legs on July 25, 2016, which negates an essential element of Pewitte's claim against her. The Court must therefore determine if Pewitte has pointed to specific contrary facts in the record that create a genuine issue for trial.

Courts may consider complaints sworn under penalty of perjury as part of the summary judgment record because such a "verified complaint . . . carries the same weight as would an affidavit[,]" *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008), and therefore "'satisfies the burden of the nonmovant to respond' to a motion for summary judgment," *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc)). Pewitte's signed his amended complaint "under penalty of perjury under the laws of the United States of America[,]" "[p]ursuant to 28 U.S.C. § 1746[.]" (Doc. No. 11, PageID# 124.) It therefore carries the same weight as an affidavit in support of Pewitte's opposition to the defendants' summary judgment motion. *See also El Bey*, 530 F.3d at 414 (holding that complaint

---

[3]    Lasix is a brand-name version of Furosemide. *See* U.S. Food & Drug Admin., *Drugs@FDA: FDA-Approved Drugs*, https://www.accessdata.fda.gov/scripts/cder/daf/ (last visited May 6, 2020).

verified and signed "under penalty of perjury pursuant to 28 U.S.C. § 1746 . . . carrie[d] the same weight as would an affidavit for the purposes of summary judgment").

Pewitte's verified amended complaint states that, in his initial health visit on July 25, 2016, he complained to Smith about his legs swelling and "showed Nurse Smith his lower legs, so that[ ] she could see the large and painful clusters of burst boils and open ulcers on his legs." (Doc. No. 11, PageID# 84, ¶ 44.) Moreover, Pewitte disputes that Smith performed any physical evaluation during the July 25, 2016 visit, stating that "the entire visit lasted less than two minutes[ ] and . . . included nothing that could be construed as an assessment of the health status of Mr. Pewitte or an evaluation of his diabetic condition." (*Id.* at PageID# 85, ¶ 48.) Pewitte also states that he was completely out of potassium chloride, vitamin B6, and Furosemide—one of the prescription medications he took for swelling and fluid retention—for eleven days before he saw Smith. (Doc. No. 11.) The medical records from this visit include the notation "med out 7/24/16" which, construed in the light most favorable to Pewitte, suggests that Pewitte was indeed out of medications before he saw Smith. (Doc. No. 49-2, PageID# 709.) The medical records also show that Smith noted no ankle edema or edema generally in Pewitte's extremities, but recorded bilateral knee pain. (*Id.*)

The defendants assert that Pewitte received thirty keep-on-person tablets of Spironolactone and Amlodipine on July 25, 2016, and thirty keep-on-person tablets of Furosemide, potassium chloride, and Meloxicam sometime in July 2016. (Doc. No. 51.) The defendants do not address whether Pewitte had his keep-on-person medications for the eleven days between his transfer to TTCC and his visit with Smith. The defendants have asserted, however, that all of Pewitte's keep-on-person "medications transferred with" him when he arrived at TTCC on July 14, 2016 (Doc. No. 51, PageID# 862, ¶ 4). The medical transfer paperwork directly contradicts this assertion by

showing that the only medications sent with Pewitte were "30" tablets of "Spironolactone" and "30" tablets of "Norvasc" (Doc. No. 49-2, PageID# 805), which is a brand-name version of Amlodipine.[4] The record therefore supports Pewitte's assertion that he was out of Furosemide, potassium chloride, and vitamin B6 for eleven days leading up to his clinic visit with Smith, which, in turn, supports Pewitte's assertion that he was experiencing swelling and related injuries in his legs. The letter Pewitte wrote to Pittman on July 24, 2016, further supports Pewitte's assertion that he was experiencing swelling and pain in his legs when he saw Smith the next day. (Doc. No. 53.)

The Court finds that Pewitte's testimony complies with Rule 56(c)(4)'s requirement that "[a]n affidavit or declaration used to . . . oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Moreover, his testimony is corroborated by record evidence and includes specific, nonconclusory assertions that he suffered injuries to his legs and that Smith was made aware of those injuries. *Cf. Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir. 1999) (holding that report and affidavit that did not include specific facts were "merely conclusory, restating the requirements of the law, and therefore [did not] create a genuine issue of material fact sufficient to defeat summary judgment").

While Pewitte's testimony could be characterized as self-serving, the Sixth Circuit has held that, "[a]lthough perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial" where "nothing in the record leads . . . to the conclusion that . . . [the statement] is demonstrably false or totally implausible." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020). The Court finds that nothing in the summary

---

[4]      *See* U.S. Food & Drug Admin., *Drugs@FDA: FDA-Approved Drugs*, https://www.accessdata.fda.gov/scripts/cder/daf/ (last visited May 6, 2020).

judgment record here compels that conclusion. The record evidence, construed in the light most favorable to Pewitte, supports Pewitte's assertion that he suffered from chronic hypertension and diabetes, that he was prescribed Furosemide to treat fluid retention and swelling, and that he had not received any Furosemide, potassium chloride, or vitamin B6 for eleven days before he saw Smith on July 25, 2016. Based on this record, it cannot be said that Pewitte's testimony about experiencing severe swelling in his legs and resulting injuries and showing those injuries to Smith is "demonstrably false or totally implausible." *Davis*, 951 F.3d at 750. The Court therefore finds that Pewitte has pointed to more than a mere scintilla of evidence supporting his position that Smith was aware of and failed to treat injuries on Pewitte's legs. *See Anderson*, 477 U.S. at 252.

Smith and Pewitte have thus provided conflicting accounts of the July 25, 2016 clinic visit, and the record evidence does not definitively support one version over the other. The Court "could resolve this dispute only by deciding to believe [Smith's] affidavit rather than [Pewitte's verified amended complaint], and such a credibility determination is inappropriate in ruling on a motion for summary judgment." *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990); *see also Green v. Miller*, No. 13–CV–14247, 2014 WL 1846063, at *5 (E.D. Mich. May 8, 2014) ("Where, as here, a motion for summary judgment essentially involves a credibility contest between the parties' versions of events as set forth in their affidavits, summary judgment is not appropriate[.]"). Courts ruling on summary judgment motions simply may not conduct a "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .'" *Anderson*, 477 U.S. at 255.

Accordingly, construing the evidence here in the light most favorable to Pewitte, as it must, the Court finds that a genuine question of fact exists because a reasonable jury could conclude, based on Pewitte's sworn testimony and the record evidence, that Smith was aware of injuries to

Pewitte's legs and failed to treat them. *See id.* at 252; *Barrett*, 556 F.3d at 511. This dispute is material to Pewitte's claim that Smith was deliberately indifferent to his serious medical needs because the need to treat burst boils and open ulcers would have been obvious to a lay person, and Smith's subsequent failure to treat those wounds could amount to a reckless disregard for a known risk of serious harm to Pewitte. *See, e.g.*, *Blackmore*, 390 F.3d at 895–97. Smith is therefore not entitled to summary judgment on Pewitte's deliberate indifference claim against her in her individual capacity.

**b.** **Coble**

Pewitte alleges that Coble was deliberately indifferent to his serious medical needs because, like Smith, Coble was aware of Pewitte's leg wounds and failed to treat them. Coble argues that he is entitled to summary judgment on this claim because "no leg pain was noted" in the medical record of Pewitte's appointment on January 3, 2017 (Doc. No. 51, PageID# 865, ¶ 17), and Coble testified that, if Pewitte "[h]ad . . . complained of leg pain, boils or ulcers, or had [Coble] seen anything of this nature, [he] would have performed additional examination and noted it in the record" (Doc. No. 49-7, PageID# 835, ¶ 5). The Court must examine the cited evidence, and may examine other record evidence, to determine if Coble has satisfied his initial burden to show that summary judgment is warranted with respect to this claim. *See Adickes*, 398 U.S. at 160; *Evans*, 687 F. App'x at 446; *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106; *see also* Fed. R. Civ. P. 56(c)(3).

The defendants' statement of undisputed material fact includes an assertion that, in the January 3, 2017 appointment, Coble noted that Pewitte had "bilateral hand pain and chronic pain syndrome, but no leg pain was noted." (Doc. No. 51, PageID# 865, ¶ 17.) This fact is also supported by the record evidence (Doc. Nos. 49-2, 49-7), and is taken as true for purposes of summary judgment. Coble's assertion about what he would have done if Pewitte had complained

of leg pain or if Coble had seen any wounds on Pewitte's legs is not included in the defendants' statement of undisputed material fact, but is supported by his affidavit testimony. Fed. R. Civ. P. 56(c)(4). Even construed in the light most favorable to Pewitte, this evidence satisfies Coble's initial burden to demonstrate the absence of a genuine dispute of fact that he was not aware of injuries to Pewitte's legs on January 3, 2017, which negates an essential element of Pewitte's claim against him. Again, the Court must determine if Pewitte has pointed to specific contrary facts in the record that create a genuine issue for trial.

Pewitte's verified amended complaint states that, when he saw Coble on January 3, 2017, he complained about "aggravated edema resulting in extreme swelling in his lower legs," among other things, and that Coble "'look[ed] at' the large and painful clusters of burst boils and open ulcers on his legs, [but] never made any significant changes to [his] prescribed medications or order[ed] any treatment for the carbuncles." (Doc. No. 11, PageID# 105, ¶¶ 123–24.) Pewitte also states that he "was completely out of several of his different keep-on-person medications from the first part of November 2016, until close to the end of January 2017 . . . ." (*Id.* at PageID# 87, ¶ 59.) In a letter to Pittman dated November 13, 2016, Pewitte complained that he was "not getting" Furosemide and that his "legs ha[d] beg[u]n to swell and split . . . or burst open in spots after blisters have formed, or pulse pockets." (Doc. No. 53, PageID# 894.) Pewitte filed a grievance the same day stating that he had "leaking sores on [his] leg because [he was] not getting meds consistently." (*Id.* at PageID# 895.) The defendants assert that Pewitte received thirty keep-on-person tablets of Furosemide sometime "in October 2016" (Doc. No. 51, PageID# 863, ¶ 11), received individual doses of Furosemide on "December 9, 10, and 11, 2016," (*id.* at PageID# 864, ¶ 16), and received thirty keep-on-person tablets of Furosemide sometime "[i]n January 2017" (*id.* at PageID# 865, ¶ 18). The defendants have not asserted that Pewitte received any keep-on-person

tablets of Furosemide in November or December 2016. This record evidence, construed in the light most favorable to Pewitte, supports Pewitte's assertion that he did not consistently receive keep-on-person tablets of Furosemide in the months leading up to his visit with Coble. An irregular supply of Furosemide, in turn, supports Pewitte's assertion that he was experiencing severe swelling in his legs and resulting injuries when he saw Coble on January 3, 2017. Furthermore, Coble has not asserted that he physically examined Pewitte during this visit, and Pewitte states that he did not. According to Pewitte, even after he complained to Coble about aggravated edema and extreme swelling in his legs, Coble "remained seated and did not perform a physical examination[,]" although Coble "did 'look at' the large and painful clusters of burst boils and open ulcers on [Pewitte's] legs . . . ." (Doc. No. 11, PageID# 105, ¶¶ 123, 124.)

The Court finds that Pewitte's verified testimony complies with the requirements of Rule 56(c)(4) and that Pewitte has pointed to specific, nonconclusory facts in the summary judgment record demonstrating that Coble was aware of severe injuries to Pewitte's legs and failed to treat them. *Cf. Doren*, 187 F.3d at 598–99. While Pewitte's testimony could again be characterized as self-serving, nothing in the record compels the conclusion that Pewitte's version of events is demonstrably false or totally implausible. *See Davis*, 951 F.3d 750. Rather, the record supports findings that Pewitte suffered from chronic hypertension and diabetes, had inconsistent access to prescribed keep-on-person tablets of Furosemide in the months leading up to his visit with Coble, and that Coble did not perform an independent physical evaluation of Pewitte during that visit. Based on this record, it cannot be said that Pewitte's testimony about experiencing severe swelling in his legs and resulting injuries and showing those injuries to Coble is "demonstrably false or totally implausible." *Id.* The Court therefore finds that Pewitte has pointed to more than a

mere scintilla of evidence supporting his position that Coble was aware of and failed to treat injuries on Pewitte's legs. *See Anderson*, 477 U.S. at 252.

Coble and Pewitte have thus provided conflicting accounts of whether Coble saw Pewitte's leg injuries during the January 3, 2017 clinic visit, and the record evidence does not definitively support one version over the other. The Court "could resolve this dispute only by deciding to believe [Coble's] affidavit rather than [Pewitte's verified amended complaint], and such a credibility determination is inappropriate in ruling on a motion for summary judgment." *Madewell*, 909 F.2d at 1206; *see also Anderson*, 477 U.S. at 255; *Green*, 2014 WL 1846063, at *5.

Accordingly, construing the record evidence in Pewitte's favor, the Court finds that a genuine issue of material fact exists because a reasonable jury could find, based on Pewitte's sworn testimony and the record evidence, that Coble was aware of serious injuries on Pewitte's legs and failed to treat them. This fact is material to Pewitte's claim that Coble was deliberately indifferent to his serious medical needs by recklessly disregarding a substantial risk of serious harm to Pewitte. Coble is therefore not entitled to summary judgment on Pewitte's deliberate indifference claim against him in his individual capacity.

### c. Schweitzer & Pratt

Pewitte alleges that Schweitzer was deliberately indifferent to his serious medical needs because, as the TTCC health services administrator, he failed to process physician's orders for Pewitte's keep-on-person medications and failed to ensure that the orders were transmitted to pharmaceutical suppliers. (Doc. No. 11.) Similarly, Pewitte alleges that, after Pratt became the health services administrator at TTCC in January 2017, she was deliberately indifferent to Pewitte's serious medical needs by failing to transmit medication orders to pharmaceutical suppliers. (*Id.*) Schweitzer and Pratt argue that they are entitled to summary judgment on Pewitte's individual capacity claims against them because they assert in the defendants' statement of

undisputed material fact that, at TTCC, only "providers ordered medications. Health Services Administrators did not order medications, nor were they involved in the approval of medication orders or the procurement of medications that were ordered[.]" (Doc. No. 51, PageID# 868, ¶ 33.) The Court accepts this assertion as true for purposes of summary judgment. Again, the Court must next examine the cited evidence, and may examine other record evidence, to determine if Schweitzer and Pratt have satisfied their initial burden to show that summary judgment is warranted with respect to these claims. *See Adickes*, 398 U.S. at 160; *Evans*, 687 F. App'x at 446; *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106; *see also* Fed. R. Civ. P. 56(c)(3).

In affidavit testimony, Stephanie Ruckman—who was employed by CCS as a nurse practitioner at TTCC (Doc. No. 49-1)—states that, "[a]t [TTCC], providers ordered medications. Health Services Administrators did not order medications, nor were they involved in the approval of medication orders or the procurement of medications that were ordered" (*id.* at PageID# 695, ¶ 35). Schweitzer's and Pratt's affidavits state that, "[a]s Health Services Administrator[s], [we] did not prescribe medications, nor did [we] approve or transmit medication orders. [We] also did not facilitate the stocking of medications[.]" (Doc. No. 49-3, PageID# 812, ¶ 19; Doc. No. 49-4, PageID# 816, ¶ 19.) But Schweitzer's and Pratt's affidavits also state that it was their role to notify the medical providers who did procure medications if prescribed medications were not received; Schweitzer and Pratt state that, "[i]f an inmate complained about not receiving medication, [we] reviewed the chart to confirm whether the medication had been received and/or ordered, and if additional actions were needed, [we] would notify CCS medical providers[.]" (Doc. No. 49-3, PageID# 811, ¶ 17; Doc. No. 49-4, PageID# 816, ¶ 17.) Thus, even taking as true that Schweitzer and Pratt "did not order medications, nor were they involved in the approval of medication orders or the procurement of medications that were ordered," the fact that they "would notify CCS

31

medical providers" when an inmate's medication had not been received describes a role in ensuring inmates received prescribed medications for inmates that is directly relevant to Pewitte's claims.

Pewitte states that he repeatedly complained about not receiving his keep-on-person medications (Doc. No. 11), and his testimony is supported by a letter in the record addressed to Pratt in which Pewitte complains about his "mandated medication(s) . . . not being ordered, or not [being made] available for month[]s . . . ." (Doc. No. 49-2, PageID# 698.) Pratt's affidavit does not address Pewitte's letter. Moreover, Schweitzer's affidavit does not address Pewitte's sworn statement that, when Pewitte asked Schweitzer why he was not receiving his keep-on-person medications, Schweitzer replied that "[h]e did not have anybody to fill the orders[ ] because" his team was "understaffed" and his "people [were] overworked[.]" (Doc. No. 11, PageID# 87, ¶ 54.) This response, which is uncontroverted for purposes of summary judgment, further suggests that health services administrators had a relevant role to play when inmates complained about not receiving medications.

The Court finds that the record evidence, construed in the light most favorable to Pewitte, supports a finding that Schweitzer and Pratt had some relevant responsibility to notify CCS medical providers when TTCC inmates did not receive prescription medications and, therefore, could have acted with deliberate indifference to Pewitte's serious medical needs regarding his keep-on-person medications. *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106 (finding that "affidavit produced by the moving party . . . purport[ed] to negate an essential element of plaintiffs' claim—timely notice—but . . . d[id] not actually do so"). Schweitzer and Pratt thus have not satisfied their initial burden to demonstrate the absence of a genuine dispute of material fact regarding an essential element of Pewitte's deliberate indifference claims against them. Summary judgment must be denied with respect to Pewitte's individual capacity claims against Schweitzer

and Pratt. *See Adickes*, 398 U.S. at 160; *Evans*, 687 F. App'x at 446; *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106.

### 2. Official Capacity Claims Against Schweitzer and Pratt

Pewitte alleges that Schweitzer and Pratt are liable in their official capacities as CCS employees for violations of his Eighth Amendment rights because they had a custom or practice of (1) failing to maintain adequate staffing levels to ensure that inmates had access to keep-on-person medications and glucose monitoring during lockdowns, and (2) failing to transmit keep-on-person medication orders and ignoring inmates' resulting complaints. (Doc. No. 11.) Claims against an individual in his or her official capacity may be treated as municipal liability claims against the entity for which the individual is an officer or agent. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Supreme Court has held that a government body or private entity performing a government function "can be found liable under § 1983 . . . where the [entity] *itself* causes the constitutional violation at issue" through execution of its own policies or customs. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original) (citing *Monell v. NYC Dep't of Soc. Sers.*, 436 U.S. 658, 694–95 (1978)). The overarching question in resolving such claims is "whether there is a direct causal link between [the entity's] policy or custom and the alleged constitutional deprivation." *Id.* For purposes of municipal liability claims, "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Here, Schweitzer and Pratt are proxies for CCS.

Courts in this circuit engage in a two-pronged inquiry when considering municipal liability claims under Section 1983. *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (quoting *Cash v. Hamilton Cty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004)); *Doe v. Claiborne Cty.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining that "[a] municipal liability claim . . . must be examined by applying a two-pronged inquiry"). "We first ask whether

the plaintiff has asserted the deprivation of a right guaranteed by the Constitution or federal law." *Powers*, 501 F.3d at 607 (first citing *Cash*, 388 F.3d at 542; and then citing *Alkire*, 330 F.3d at 813). Second, we ask whether the defendant entity is "responsible for that deprivation." *Cash*, 388 F.3d at 542 (citing *Doe*, 103 F.3d at 507); *cf. Powers*, 501 F.3d at 607 (asking "whether the alleged deprivation was caused by the defendants . . .").

### a. Pewitte Has Asserted A Federally Protected Right

Under the first prong of a municipal liability analysis, courts must consider whether the plaintiff has asserted "rights [that] are federally protected such that, if proven, § 1983 will provide relief for their infringement." *Powers*, 501 F.3d at 607; *see also Cash*, 388 F.3d at 542 ("First, the court must determine whether the plaintiffs have asserted the deprivation of a constitutional right.") (citing *Doe*, 103 F.3d at 505). Importantly, this prong of the inquiry asks the court to "examin[e] the nature of the right claimed to have been infringed upon" and not to determine the merits of the claim. *Doe*, 103 F.3d at 506; *see also Cash*, 388 F.3d at 542 ("The threshold question is 'whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property.'").

The defendants' argument that Pewitte's claim fails at this step because he "cannot establish that he suffered a constitutional violation" is therefore misplaced. (Doc. No. 50, PageID# 858.) There is no question that Pewitte has asserted that the denial of adequate medical care at TTCC violated his Eighth Amendment rights. Further, even assuming that Pewitte were required to prove a constitutional violation at the first prong of the municipal liability inquiry, the Court has already found that there is a genuine dispute of material fact regarding Pewitte's claims that Smith and Coble violated his Eighth Amendment rights and that the defendants have failed to establish the absence of a genuine dispute of material fact regarding Pewitte's Eighth Amendment claims against Schweitzer and Pratt in their individual capacities.

34

### b. The Defendants Have Not Carried Their Burden To Show An Absence of Genuine Issues of Material Fact Regarding Pewitte's Official Capacity Claims Against Them

Under the second prong of the municipal liability inquiry, plaintiffs "must 'identify the policy, connect the policy to the [municipal entity] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Estate of Graham*, 358 F.3d at 383 (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). A plaintiff may prove the existence of a policy or custom that is actionable under Section 1983 in four ways:

> The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted). "The Sixth Circuit applies specific inquiries for . . . claims based on each theory to determine whether plaintiffs have identified a custom or policy, connected the policy to the defendant . . . entity, and shown that the custom or policy was the moving force behind the alleged injury as required." *Whitworth v. CoreCivic, Inc.*, No. 3:17-cv-01121, 2019 WL 1427934, at *13 (M.D. Tenn. Mar. 29, 2019); *see also Connick v. Thompson*, 563 U.S. 51, 61–63 (2011) (articulating standard for failure-to-train theory); *Thomas*, 398 F.3d at 429 (articulating four-part inquiry for claims based on inaction theory).

Here, Pewitte alleges that CCS had a custom or practice of (1) failing to maintain adequate staffing levels to ensure that inmates had access to keep-on-person medications and glucose monitoring during lockdowns, and (2) failing to transmit keep-on-person medication orders and ignoring inmates' resulting complaints. (Doc. No. 11.) Specifically, Pewitte alleges that CCS failed to "maintain adequate staffing levels to ensure the delivery of prescribed keep-on-person medication" and "to ensure twice daily monitoring of glucose levels during several prison lock-

downs when [inmates] could not present to the medical infirmary . . . ." (*Id.* at PageID# 115, 117, ¶¶ 158, 168; *see also id.* at PageID# 119, ¶¶ 172,173.) He further alleges that CCS health services administrators repeatedly failed to transmit orders for prescribed keep-on-person medications to pharmaceutical suppliers and that CCS had a "practice and policy of disregarding or ignoring" complaints regarding deprivation of medications. (*Id.* at PageID# 119, ¶ 174.) These allegations correspond to "a custom of tolerance or acquiescence of federal rights violations[,]" otherwise known as an "inaction theory" of municipal liability "where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched." *Thomas*, 398 F.3d at 429. To prevail under an inaction theory, the plaintiff alleging municipal liability must show:

> (1) the existence of a clear and persistent pattern of illegal activity;
>
> (2) notice or constructive notice on the part of the defendant;
>
> (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Id.* (alterations omitted) (quoting *Doe*, 103 F.3d at 508); *see also Milligan v. United States*, 644 F. Supp. 2d 1020, 1040 n.13 (M.D. Tenn. 2009) (citing *Thomas*, 398 F.3d at 429).

The defendants argue that they are entitled to summary judgment on Pewitte's official capacity claims because Pewitte cannot show that CCS policies led to a violation of his constitutional rights. (Doc. No. 50.) The defendants assert in their statement of undisputed material fact that (1) "CCS did not employ security staff, nor did CCS handle security, lock downs, or access to inmates" (Doc. No. 51, PageID# 861, ¶ 2); (2) "[d]uring lock down periods, the practice was for nurses to come to the units for pill call and diabetic call" while escorted by security staff (*id.* at PageID# 869, ¶ 35); and (3) "[a]n inmate could choose whether to participate in pill call and

diabetic call" (*id.* at PageID# 869, ¶ 38). The defendants further assert that "Health Services Administrators . . . were not involved with determining the number of medical staff who worked at any given time . . . ." (*Id.* at PageID# 868, ¶ 32.)

Even assuming that these assertions about CCS's official policies are true and supported by the record evidence, they are insufficient to carry the defendants' initial burden to make a prima facie showing that they are entitled to summary judgment on Pewitte's official capacity claims. As explained above, Pewitte has alleged that CCS had an unwritten policy, practice, or custom of condoning (1) clinic staffing levels that were insufficient to provide inmates with access to keep-on-person medications and glucose monitoring during lockdowns and (2) repeated deprivations of prescribed keep-on-person medications even when the facility was not locked down. The defendants' assertions do not directly address these claims. For example, while the defendants assert that, "[d]uring lock down periods, the practice was for nurses to come to the units for pill call and diabetic call" escorted by security staff (*id.* at PageID# 869, ¶ 35), they do not address Pewitte's claim that CCS maintained inadequate staffing levels to *implement* this practice. The defendants have asserted that Schweitzer and Pratt were not personally involved in determining staffing levels but, because these are official capacity claims, it is CCS's action or inaction that is relevant. Moreover, the defendants have not addressed the specific legal standards governing inaction theory claims and have not analyzed the relevant factual and legal issues specific to Pewitte's particular claims. *See Woodby v. Bradley Cty.*, No. 1:07-cv-3, 2008 WL 5245361, at *13 (E.D. Tenn. Dec. 16, 2008) (finding that defendants "failed to meet their initial burden of establishing an absence of a dispute of material fact" and denying in part motion for summary judgment where defendants did "not set forth the applicable legal standards and . . . failed to analyze the relevant issues").

The Court therefore finds that the defendants have not satisfied their initial burden to demonstrate an absence of any genuine dispute of material fact regarding an essential element of Pewitte's official capacity claims against Schweitzer and Pratt. Summary judgment must be denied with respect to Pewitte's official capacity claims. *See Adickes*, 398 U.S. at 160; *Evans*, 687 F. App'x at 446; *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the defendants' motion for summary judgment (Doc. No. 49) be DENIED.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 7th day of May, 2020.

ALISTAIR E. NEWBERN
United States Magistrate Judge